### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

MICHELLE COAD,

      Plaintiff,

   v.                               Docket No. 1:14-cv-254-NT

BUCKMAN LABORATORIES, INC.,

      Defendant.

### ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendant Buckman Laboratories, Inc.'s ("**Buckman**" or the "**Defendant**") motion for summary judgment (ECF No. 30) on all of Plaintiff Michelle Coad's ("**Coad**" or the "**Plaintiff**") claims, and Coad's partial motion for summary judgment (ECF No. 44) on her breach of contract, unpaid wages, and personnel file claims. For the reasons stated below, the Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**, and the Plaintiff's motion is **GRANTED IN PART** and **DENIED IN PART**.

### BACKGROUND[1]

At the summary judgment stage, I view the record in the light most favorable to the nonmovant, drawing all reasonable inferences in that party's favor. *Noonan v.*

---

[1]     Buckman filed a "Reply to Plaintiff's Response to Defendant's Statement of Undisputed Material Facts and Response to Plaintiff's Statement of Additional Facts" (ECF No. 46). In this filing, Buckman properly replied to Coad's objections but also interposed additional "replies" to many of Coad's denials/qualifications. Under Local Rule 56(d), "[a] party replying to the opposition to a motion for summary judgment shall submit with its reply a separate, short, and concise statement of material facts *which shall be limited to any additional facts submitted by the opposing party*." (emphasis added).

*Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). Thus, I recount the facts—to the extent they are supported by the record—in the light most favorable to Coad when considering her claims for gender discrimination, disability discrimination, and whistleblower retaliation. And because the parties have filed cross-motions for summary judgment on the breach of contract, unpaid wages, and personnel file claims, I "consider each motion separately, drawing inferences against each movant in turn." *Showtime Entm't, LLC v. Town of Mendon*, 769 F.3d 61, 69 (1st Cir. 2014) (citation and internal quotation marks omitted).

### Coad's Job at Buckman

In January of 2012, Coad began working as an account manager for the northeast region of Buckman's Paper Technologies Division. Def.'s Statement of Material Facts ¶ 1 ("**DSMF**") (ECF No. 30-2). Coad worked as the account manager for the Verso Corporation ("**Verso**") paper mill in Bucksport, Maine. DSMF ¶ 2. Coad's regional manager was John Desjardins, and he reported to Roger Smithson, Buckman's sales director. DSMF ¶¶ 4-5. Matt Archambeau was the general manager of the Verso mill in Bucksport, and Carrie Enos was the operations manager. DSMF ¶¶ 6-7.

---

And although Local Rule 56(e) allows the moving party to reply to the non-moving party's requests to strike, "[t]his court has consistently rejected any other attempted 'replies.'" *Brooks v. Local S7*, No. CIV 07-30-P-S, 2008 WL 4516363, at *4 n.2 (D. Me. Oct. 3, 2008); *see also Dobbins v. Postmaster Gen. & CEO*, U.S.P.S., No. CIV. 05-CV-140-B-W, 2007 WL 295215, at *10 n.6 (D. Me. Jan. 29, 2007); *Vertrue Inc. v. Graham*, No. 06-135-P-S, 2007 WL 2198888, at *1 (D. Me. July 17, 2007). Accordingly, I do not consider Buckman's additional "replies" to Coad's responses.

Andy Zebiak was Buckman's previous account manager for the Verso mill; Verso had not been satisfied with his performance. Pl.'s Statement of Additional Material Facts ¶ 95 ("**PSAMF**") (ECF No. 40). Coad was hired by Buckman to "stabilize and develop business" with Verso. DSMF ¶ 3. To that end, Coad provided "good customer service to Verso and solidified Buckman's position at the mill," and "everyone was happy with her job performance through December 2012." PSAMF ¶¶ 103-104. Moreover, after Coad was hired as the Verso account manager, Verso never expressed dissatisfaction with Buckman's performance. PSAMF ¶ 110. Rather, Archambeau told Smithson "numerous times that . . . Coad had done a phenomenal job." PSAMF ¶ 169.

### Safety-Related Incidents

During her employment at Buckman, Coad observed and reported several safety-related incidents, many of which involved Buckman's Oxamine unit. The Oxamine system was a water disinfecting project that Buckman was developing for the Verso mill. Coad Dep. 153:1-5 (ECF No. 30-11). In October of 2012, when Buckman began the Oxamine trial at Verso, a Verso employee asked Coad "to disclose the chemistry of potentially vented gas from the Oxamine system." Coad Aff. ¶ 7 (ECF No. 40-1). In order to do this, Coad e-mailed Buckman's Principal Scientist, Dr. Thomas McNeel. PSAMF ¶ 137; Ex. A to Coad Aff. Coad asked Dr. McNeel what gases would be produced and what would be the approximate evacuation radius if the wrong chemicals were mixed in the Oxamine unit. Ex. A to Coad Aff. Dr. McNeel responded that "[t]he gases produced will be a mixture of monochloramine,

dichloramine, nitrogen trichloride, and chlorine. The major problematic components of these gases will be nitrogen trichloride and chlorine." PSAMF ¶ 137. In terms of an evacuation radius, Dr. McNeel opined: "The only answer that I can give is that if you smell it, run away. As long as you can still smell it, keep running……" PSAMF ¶ 137.

On one occasion, Coad witnessed Andy Zebiak return from the Oxamine system coughing, hacking, with his eyes watering, and waving his hand in front of his face. Coad Dep. 143:23-144:1-4. Zebiak said that "there [were] leaks out there" and that they "need[ed] better ventilation." Coad Dep. 144:5-14, 145:19-21. Coad told Desjardins that they needed to report this to the mill—especially since the Buckman employees were getting ready to go home for the day and no one would be there to monitor the Oxamine system at night—but Desjardins said they were not going to report the incident to the mill. Coad Dep. 144:15-23.

On another occasion in December of 2012, Coad sent an e-mail to Buckman safety personnel reporting "a sodium hypochlorite leak at [Buckman's] Oxamine unit." Ex. 6 to Desjardins Dep. (ECF No. 40-4). Coad reported that, while trying to fix the leak, an absorbent towelette she was using began to smolder and became warm. Ex. 6 to Desjardins Dep. Coad further noted that the Oxamine unit had many leaks and criticized the ergonomic access to the unit. Ex. 6 to Desjardins Dep.

Additionally, after Coad had been working at Buckman for a few months, she discovered chemicals in unlabeled portable tanks and informed Desjardins. PSAMF ¶ 114. Coad found this very concerning because it was an OSHA violation for the

4

tanks to be unlabeled. Coad Dep. 73:5-9. When Coad asked Desjardins what she should do with the tanks, Desjardins was initially reluctant to do anything. Coad Dep. 73:14-18. Coad also learned at some point that an unused cleaning solution was poured down the mill's sewer in violation of mill policy, and she later disclosed this information to Archambeau. DSMF ¶ 85; Archambeau Aff. ¶ 5 (ECF No. 40-2). Coad further complained that Buckman employees were not using respirators while performing felt washes—a process that cleans the felt-covered rollers that make paper. DSMF ¶¶ 85, 86.

### Gender Discrimination

Coad also felt that she was being treated differently by Buckman because of her gender. On one occasion, Smithson told Coad that "he paid another employee more than his counterpart because he had a wife and children." Coad Dep. 108:5-7. Smithson was also critical of the job performance of Carrie Enos, Verso's operations manager, even though she was "very highly regarded." Coad Dep. 108:17-21.

Coad initially had the authority to delegate tasks to other Buckman employees when she was hired as an account manager. That authority was removed in early 2013 because Buckman's male employees were not happy with her management and she "was being very difficult on the other representatives in the account." PSAMF ¶ 109; Def.'s Resp. to Pl.'s Statement of Additional Material Facts ¶ 109 ("**DRPSAMF**") (ECF No. 46); Smithson Dep. 66:13-15 (ECF No. 30-9); Desjardins Dep. 30:5-12. However, Verso did not express any dissatisfaction with Coad's performance. PSAMF

¶ 110. And Smithson never took away delegatory authority for a male account manager who worked for him during his tenure at Buckman. PSAMF ¶ 171.

### Coad's Unhappiness with her Job

Although Coad was performing her job well in 2012, she began to express her dissatisfaction after she had been there for a "couple of months." DSMF ¶ 13; Coad Dep. 177:12-16. Coad was unhappy because she thought that the job was different than what had been described to her when she interviewed for the position. Coad Dep. 176:22-177:1-14. She also was dissatisfied with her lack of authority, her salary, the number of hours she was working, and staffing levels. Coad Dep. 178:2-3; 178:9-25; 179:14; Coad Aff. ¶ 5.

In January of 2013, Coad met with Desjardins and Smithson. Coad Dep. 180:7-13.   At this meeting, Coad expressed her dissatisfaction with the job and told Desjardins and Smithson that "if the job did not change, [she] could not go on in the job." DSMF ¶ 19. In February of 2013, both Desjardins and Smithson told Coad that the job was not going to change. Coad Dep. 180:22-181:1-2.

### Coad's Anxiety

In the late summer or early fall of 2012, Coad began to experience symptoms of anxiety. PSAMF ¶ 138. Coad's symptoms "included an inability to focus or concentrate, sleep disruption, difficulty forming rational thoughts, nausea, and racing thoughts." PSAMF ¶ 139. Coad also had difficulty interacting with others, including her husband, and she avoided social situations and became "somewhat of a

hermit." PSAMF ¶ 139. By November of 2012, Coad's anxiety significantly increased, and it continued to worsen "until she started seeking treatment with a counselor, Nancy Plouffe, in February 2013 and also with her primary care provider, Zoe Tenney." PSAMF ¶ 138. Tenney diagnosed Coad with acute anxiety. PSAMF ¶ 198.

On February 7, 2013, Coad left work early because she was very upset, stressed, and tired. PSAMF ¶ 140. Smithson sent a text message to Coad on February 7th, stating: "I know there are several things that are bothering you. I would like to talk when it's convenient for you." Ex. 15 to Coad Dep. (ECF No. 40-3). Coad responded: "I can't talk right now. I'll call later," to which Smithson replied "[c]all anytime." Ex. 15 to Coad Dep. Coad called out sick from work on Friday, February 8, 2013, and was out for a previously scheduled vacation from February 11th to the 13th. PSAMF ¶ 142. On February 12, 2013, Smithson sent another text message to Coad while she was on vacation, writing: "[w]e never got to talk last week. Please call this week if you want. I would like to help if I can." Ex. 15 to Coad Dep.; PSAMF ¶ 143. Coad did not respond to Smithson's message before she returned to work on February 14, 2013. DSMF ¶ 26.

### Coad's Meeting with Verso Employees

When Coad returned to work, Enos asked Coad how things were going, and Coad told Enos that she was having a hard time with her job. Coad Dep. 182:20-183:2. Shortly after this conversation, Enos asked Coad to meet with her and Archambeau. PSAMF ¶ 145; Coad Dep. 183:6-16. Before that meeting, Smithson had told Archambeau that he was concerned Buckman was going to lose Coad. Coad Dep.

183:2-16. Archambeau's intention in meeting with Coad was to "facilitate [a] resolution of the issues between [Coad] and Buckman, so that [Coad] would stay on as account manager." Archambeau Aff. ¶ 10. During their meeting, Coad expressed dissatisfaction with her job and also informed Archambeau about two incidents that she considered safety concerns: (1) leaks in the Oxamine system; and (2) the discharge of chemicals into Verso's drainage system. Archambeau Aff. ¶ 5. Archambeau did not consider these incidents safety concerns, but he did not express this belief to Coad. Archambeau Aff. ¶ 5.

Archambeau offered to intervene with Smithson to address some of Coad's concerns, and he later had a conversation with Smithson about Coad. PSAMF ¶ 149; Archambeau Aff. ¶ 6. Archambeau subsequently reported to Coad that Smithson was upset because Coad had not responded to his last text message. PSAMF ¶ 150. Archambeau also told Coad he was unable to help because Coad and Smithson were "worlds apart" and that Coad "might want to start talking to them about an exit strategy." PSAMF ¶ 151.

### Coad's Relationship with Buckman Continues to Deteriorate

On February 19, 2013, Coad sent an e-mail to several Buckman employees, and copied the e-mail to Smithson and Desjardins. PSAMF ¶ 152. After receiving Coad's message, Smithson and Desjardins exchanged the following e-mails:

> **Smithson**: 5 questions, and 3 commands on one email. Doesn't really look like someone that is leaving soon.
> **Desjardins**: it would seem unlikely.
> **Smithson**: I intend to change that next Tuesday morning.

8

**Desjardins**: Agreed!

PSAMF ¶ 153. During a telephone conversation between Coad and Smithson on February 22, 2013, Smithson told Coad that "the job [wasn't] going to change, that [she] had complained enough, and that [she] had defied him." Ex. 16 to Coad Dep. (ECF No. 46-1). Smithson further told Coad that he did not think she could be happy with her job, and that he was requesting a meeting in person on the following Tuesday in Bangor. Ex. 16 to Coad Dep. The following Tuesday was February 26, 2013—the same date referenced in Smithson's February 19th e-mail to Desjardins. PSAMF ¶ 154.

On February 26th, Coad met with Smithson and Karen Damrell from Buckman's Human Resources department. PSAMF ¶ 156. During this meeting, Smithson told Coad that her "performance had been disappointing and that [she] had not been able to move the [Verso] account forward."[2] PSAMF ¶ 157. Smithson also repeatedly told Coad that she had "defied him," PSAMF ¶ 156, and that he had a responsibility to protect Buckman employees from the "rage inside" of her. Ex. 16 to Coad Dep.  As a result, Coad was asked to sign a formal management referral that

---

[2]     Buckman argues that the assertion in Coad's affidavit that Smithson criticized her job performance at the February 26th meeting was absent from her deposition and her MHRC charge and was inconsistent with her deposition testimony that her job performance was never criticized. DRPSAMF ¶ 157. Buckman denies PSAMF ¶ 157 but has not requested that I strike Coad's affidavit. *See* Local Rule 56(e). In her deposition, Coad seems to be addressing her entire tenure at Buckman rather than solely the February 26th meeting. Taken in the light most favorable to Coad, her deposition can be interpreted as a statement that before the February 26th meeting, her performance had not been criticized. That interpretation is supported by inferences that can be drawn from other record evidence as well. Smithson's e-mail indicating that he intended to force Coad's resignation at the February 26th meeting and the requirement that Coad complete anger management counseling, itself an implicit criticism, support the claim that Smithson criticized Coad's performance at the February 26th meeting. Buckman will of course be free to explore any alleged inconsistencies at trial.

required her to attend anger management counseling and work with Buckman's employee assistance program (the "**EAP**"). DSMF ¶ 42; PSAMF ¶ 158. Coad was told that she would not be allowed to return to work until a Buckman representative cleared her to do so. Ex. 16 to Coad Dep. After the meeting, Coad's administrative ID and password were scrambled so that she could not access Buckman's system or her e-mails. PSAMF ¶ 159.

### Coad's Leave of Absence

The February 26th meeting was very upsetting for Coad. Coad Dep. 211:9-18. Still, she set up anger management counseling with her counselor, Nancy Plouffe, and Plouffe later informed Buckman that Coad did not have anger management issues.[3] PSAMF ¶¶ 172-73. But Coad was told by Paula Wilkinson, an EAP employee, that she still needed to see Plouffe once a week as a condition of her employment. Coad Dep. 209:21-210:2.

Although Coad was released to return to work on March 4, 2013, she was still upset and confused because of Wilkinson's "stated requirement of continued treatment, so [Coad] saw her doctor, who recommended that [Coad] remain out of work for a few weeks."[4] PSAMF ¶ 175. As a result, on February 28, 2013, Coad was given a medical excuse putting her off work from March 4th to March 11th. Coad Dep.

---

[3]     Buckman denied PSAMF ¶ 173, contending that Coad testified that she had no "knowledge of what was shared between the EAP and Buckman." DRPSAMF ¶ 173. I consider PSAMF ¶ 173 because it is fully supported by the record. Any purported inconsistency can be tested at trial.

[4]     Coad challenged Wilkinson's ability to require her to continue counseling, and Wilkinson later called Coad to apologize and told her that she was not required to continue counseling. PSAMF ¶ 174; Coad Dep. 210:2-16.

211:22-212:2. Buckman designated Coad's leave as Family Medical Leave Act ("**FMLA**") leave, effective March 4, 2013. DSMF ¶ 51. Tenney gave Coad another medical excuse on March 6, 2013 extending her leave to March 18th. *See* PSAF ¶ 176; Ex. 21 to Coad Dep.

Coad remained out of work for several weeks. PSAMF ¶ 176. On April 1, 2013, Tenney released Coad to return to work on April 8, 2013 for four hours a day for two weeks until Tenney could reevaluate her to determine whether she could return to work full-time. PSAMF ¶ 176; Tenney Dep. 75:17-25; 76:5-11, 21-24 (ECF No. 46-2). At this time, Tenney had not concluded that Coad's restriction to part-time work was permanent because she did not "know what would have happened if [Coad] had gone back [to work] half-time." Tenney Dep. 89:13-14 (ECF No. 30-10). Instead, Tenney hoped that Coad would be able to transition from a part-time schedule to a full-time schedule. PSAMF ¶ 197; Tenney Dep. 122:11-17. But Tenney never spoke with anyone at Buckman. Tenney Dep. 116:25; 117:1-5.

On April 3, 2013, Carla Bradley, Buckman's benefits manager, sent Coad a letter stating:

> We received the note from your medical provider requesting light duty for you from April 8, 2013 until you are reevaluated on April 15, 2013. Buckman does not have a light duty position for account managers. As you know, an account manager position means driving and visiting with customers on site, and discussing product needs, which is a full time job. You are currently on paid leave.

PSAMF ¶ 177. On April 8, 2013, Coad e-mailed Bradley and asked her to reconsider, writing:

> I would like to ask that you reconsider allowing my return to work per my medical provider's recommendations. My only account, which I normally visit on a daily basis, is a short commute from my home. I have never been asked to drive to and visit other accounts. My doctor has not indicated any physical restrictions for me to return to work, only reduced hours. I believe this could by easily accommodated.

Ex. 27 to Coad Dep. Nine minutes later, Bradley responded: "I am sorry but Buckman has made the determination that we do not have light duty for an account manager position." Ex. 27 to Coad Dep.

On April 15, 2013, Tenney sent Buckman another medical excuse, putting Coad off work from April 15th to May 13th and noting that Coad "is able to return on a half time basis (4 hours per day schedule) but apparently this is not an option." Ex. 28 to Coad Dep. On April 25, 2013, Tenney advised that Coad's leave should be extended by three days to May 16, 2013, and on May 16th Tenney again advised that Coad could "work only half time, no more than 20 hours a week." DSMF ¶¶ 66, 71. Coad's FMLA leave was exhausted by May 16, 2013, but Buckman extended her leave and assisted her in applying for short-term disability benefits. DSMF ¶ 72, 73. On July 22, 2013, Tenney excused Coad from "FULL TIME work" until October 22, 2013, and again noted that Coad could return to work on a part-time basis. Ex. 31 to Coad Dep. 36 (ECF No. 40-3).

All of Coad's medical excuses were sent directly to Buckman. Coad Dep. 212:23-213:1. And each medical excuse included language inviting Buckman to follow up with Tenney if they had any questions. PSAMF ¶ 199; Tenney Dep. 122:18-22. No one at Buckman ever contacted Tenney to discuss Coad's medical excuses. Tenney

Dep. 122:23-123:2. And Tenney never spoke with anyone at Buckman about Coad working four hours a day or some alternative arrangement. Tenney Dep. 84:19-24.

### Coad's Termination

On July 26, 2013, Buckman sent Coad a letter notifying her that her position had been terminated. Ex. 34 to Coad Dep. 114. Enclosed with the letter was an interoffice memorandum dated July 15, 2013, which stated in part:

> This termination is based on the following: (i) your unacceptable performance with Buckman's customer prior to your leave, (ii) the customer's request that you not be part of the Buckman team at the mill and (iii) there are no other customers in Maine to assign you to for your position. Moreover, as we have explained, your position is not a part time position and we do not have a part time position for you. Finally, we must fill your position with a full time associate to fully service Buckman's customer for its product and technical needs.

Ex. 34 to Coad Dep. Archambeau, Verso's account manager, did not request Coad's removal as the account manager at the Bucksport mill and was not "aware of anyone else at Verso requesting [Coad's] removal, which is something he would expect to be notified of." PSAMF ¶ 191.

On July 30, 2013, Smithson forwarded an e-mail from human resources referencing Coad's termination with the comment: "APPROVED!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!" PSAMF ¶ 185. Smithson had been pushing for a resolution of Coad's situation and was involved in Buckman's decision to terminate her position. PSAMF ¶ 188.

### Coad's Employment Contract

Coad's employment contract with Buckman provides in part:

> [Buckman] has agreed and does hereby agree to employ [Coad], and [Coad] has agreed and does hereby agree to accept employment by [Buckman] in the performance of such duties as may be designated and assigned by [Buckman] from time to time . . .
>
> The first one hundred eighty (180) days of employment shall be a probationary period during which either party may terminate the employment relationship at any time, without prior notice, and with or without cause. After the end of the probationary period, employment may be terminated by either party, with or without cause, upon no fewer than forty-five (45) days' notice in writing of such termination . . .
>
> The aforesaid duties and work of [Coad] for [Buckman] shall be [Coad's] sole employment during the life of the agreement . . . .

Ex. 5 to Coad Dep. The contract also guaranteed Coad four weeks of vacation for 2013. Ex. 5 to Coad Dep.

On September 25, 2013, Coad's attorney sent a letter to Buckman demanding $47,086.63 in wages, commissions, 401K matching, pay for 45 days' notice, and two weeks' worth of vacation pay. DSMF ¶ 92. The letter also requested a copy of Coad's personnel file. *See* Ex. 2 to DSMF (ECF No. 30-3). In response, Buckman sent Coad an e-mail describing what it was willing to pay, along with a cashier's check for $27,607.38. DSMF ¶ 93. Coad ultimately received her entire personnel file through discovery after she initiated this lawsuit. DSMF ¶ 94.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, courts "view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d

78, 89 (1st Cir. 2013). Faced with cross-motions, courts must "decide 'whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.' " *Fid. Co-op Bank v. Nova Cas. Co.*, 726 F.3d 31, 36 (1st Cir. 2013) (quoting *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)).

## DISCUSSION

Coad advances three employment discrimination claims against Buckman: (1) gender discrimination; (2) disability discrimination/failure to accommodate; and (3) whistleblower employment discrimination. Buckman moves for summary judgment on all of these claims. Coad also presses claims for breach of contract, unpaid wages, and a violation of Maine's personnel file law. Both parties move for summary judgment on these claims. I first address Coad's discrimination claims before turning to the parties' cross-motions.

## I.    Gender Discrimination—Count III

The Maine Human Rights Act (the "**MHRA**") makes it unlawful for an employer to discriminate against an employee because of the employee's sex "with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment." 5 M.R.S.A. § 4572(1)(A). In analyzing claims under the MHRA, Maine courts apply federal case law interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. Martin v. Inhabitants of City of Biddeford*, 261 F. Supp. 2d 34, 37-38 (D. Me. 2003). Accordingly, the Court will consider both Maine and federal law when analyzing the Plaintiff's claim under the MHRA.

## A. *McDonnell Douglas* Burden-Shifting Framework

In the absence of direct evidence of discrimination, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first establish a prima facie case of discrimination, thereby creating an inference of discrimination. *Johnson v. Univ. of P.R.*, 714 F.3d 48, 53 (1st Cir. 2013). If the plaintiff meets this initial burden," 'the burden of production—but not the burden of persuasion—shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the adverse employment action.' " *Id.* (quoting *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 470 (1st Cir. 2010)). If the employer articulates a non-discriminatory reason for the adverse employment action, then "the focus shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory." *Lockridge*, 597 F.3d at 470. " 'The plaintiff at all times retains the ultimate burden of persuasion on the question whether unlawful discrimination has occurred.' " *Doyle v. Dep't Of Human Servs.*, 824 A.2d 48, 54 (Me. 2003) (quoting *Me. Human Rights Comm'n v. Dep't of Corr.*, 474 A.2d 860, 867 (Me. 1984)).

In order to create a presumption of gender discrimination, Coad must establish that: (1) "she is a member of a protected class;" (2) "that an adverse employment action was taken against her;" (3) "that she was otherwise qualified;" and (4) "that her position remained open or was filled by a person with qualifications similar to hers." *García v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 30 n.2 (1st Cir. 2008). Here,

16

Coad has met this initial burden, and thus the burden of production shifts to Buckman to articulate legitimate, non-discriminatory reasons for Coad's adverse employment action.

On this front, Buckman has marshalled two non-discriminatory reasons for Coad's termination. First, Buckman asserts that Coad was fired because she disrupted Buckman's relationship with Verso by attempting to force Verso "to side with her in her ongoing battle with Buckman over her pay and job responsibilities," (the "disloyalty reason"). Def.'s Mot. for Summ. J. 4.  Second, Buckman offers that it fired Coad because "she had been on a stress-related leave of absence from full-time work for almost five months and had submitted a medical excuse extending her leave for an additional three months with an open-ended date of return," (the "no part-time position reason"). Def.'s Mot. for Summ. J. 3-4. Having satisfied its burden, the focus shifts back to Coad to show that Buckman's proffered reasons for her termination were in fact pretext designed to disguise gender-based discrimination.

### B. Pretext

There are several ways an employee can show pretext, including "by showing weaknesses, inconsistencies and contradictions in the employer's proffered legitimate reasons for termination." *Trafton v. Sunbury Primary Care, P.A.*, 689 F. Supp. 2d 180, 197 (D. Me. 2010). Coad argues that both of Buckman's proffered legitimate reasons for termination are false, and she contends that Buckman's "shifting explanations" for her "termination are highly probative of discriminatory intent." Pl.'s Opp'n & Partial Mot. for Summ. J. 11-12 ("**Pl.'s Opp'n**") (ECF No. 39)

First, taken in the light most favorable to Coad, there is sufficient evidence to allow a reasonable jury to conclude that Buckman's disloyalty reason for termination was pretextual. Archambeau had heard from Smithson that Buckman was concerned that they were going to lose Coad. Coad Dep. 183:6-16. On February 14, 2013, Verso employee Carrie Enos contacted Coad and asked Coad to meet with her and Archambeau. PSAMF ¶ 145; Coad Dep. 183. Archambeau wanted to resolve the problems between Coad and Buckman so that Coad would remain on as the Buckman employee managing the Verso account. PSAMF ¶ 148. Archambeau offered—and eventually did—speak with Smithson on Coad's behalf regarding Coad's concerns. PSAMF ¶¶ 149-151. When viewed in the light most favorable to Coad, a reasonable jury could conclude that Coad was not disrupting Buckman's relationship with Verso or trying to force Verso to side with her against Buckman. A jury could reasonably conclude that Buckman expected (and even encouraged) Archambeau to meet with Coad, and that Archembeau advocated on behalf of Coad because he valued working with her and wanted her to remain with Buckman.

Second, a jury could also reasonably discredit the "no part-time position" justification for Coad's termination given that Smithson's e-mail to Desjardins suggested that Smithson was going to try to force Coad to leave Buckman in February of 2013 *before* she requested a part-time position. *See* PSAMF ¶ 153.

Buckman's explanations for Coad's termination are inconsistent, and they have changed over time. *See Vélez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 449 (1st Cir. 2009) (giving different reasons at different times suggests fabrication). In

July of 2013, Buckman told Coad that she was terminated because of (1) "unacceptable performance with Buckman's customer prior to [her] leave," and (2) "the customer's request that [she] not be part of the Buckman team at the mill." PSAMF ¶ 190. But record evidence indicates that Coad's performance was far from "unacceptable" [5] and that Verso never requested Coad's dismissal. Archambeau told Smithson on numerous occasions that Coad was doing "a phenomenal job" working with Verso. PSAMF ¶ 169. Verso never expressed dissatisfaction with Coad's performance as account manager, although it was unhappy with Buckman's previous account manager. PSAMF ¶¶ 96, 110. And Archambeau never requested that Coad be replaced and was unaware of anyone else making such a request.[6] PSAMF ¶ 191.

Because Coad has presented sufficient evidence to show that Buckman's arguments were pretextual, and because that same evidence can support a finding of discriminatory intent, I do not need to address Coad's arguments that she was treated differently than similarly situated male counterparts. *See DeCaire v. Mukasey*, 530 F.3d 1, 20 (1st Cir. 2008) (plaintiff not required to present evidence beyond disproving

---

[5] Buckman contends that when it stated that Coad's performance was unacceptable it was referring to the disloyalty reason for termination. Def.'s Reply & Mem. Of Law in Opp'n to Pl.'s Partial Mot. for Summ. J. 4 ("**Def.'s Reply**") (ECF No. 45). But the written reasons for termination did not state that Coad was disloyal, but rather that her performance with Verso was "unacceptable." PSAMF ¶ 190. Smithson's comments at his February 26, 2013 meeting with Coad that her "performance had been disappointing and that [she] had not been able to move the [Verso] account forward" further support the unacceptable performance rationale. Coad Aff. ¶ 9 (ECF No. 40-1). A jury could reasonably conclude that Buckman's reference to Coad's "unacceptable performance" comment in July of 2013 concerned her job performance, rather than any disloyalty.

[6] Additionally, a finding of pretext can be supported by discriminatory comments made by a key decisionmaker. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir. 2000). Coad claims that Smithson, who was involved in her termination, once told her "he paid another employee more than his counterpart because he had a wife and children" to support. Coad Dep. 108:5-16 (ECF No. 30-11); PSAMF ¶ 188. The comment may be probative of gender bias.

defendant's arguments as pretext). Viewed in the light most favorable to Coad, Buckman initially offered at least one false reason and gave different reasons at different times for Coad's termination. There is sufficient evidence to create a genuine issue of fact regarding Buckman's motivation for terminating Coad.

## II.   Failure to Accommodate/Disability Discrimination—Count II

Coad claims that Buckman violated the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* (the "**ADA**") and the MHRA by discriminating against her on the basis of her disability and by failing to reasonably accommodate her disability. An ADA claim can be based on two separate theories of liability—(1) disparate treatment; and (2) failure to accommodate. *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002). For a disparate treatment claim, a plaintiff must show that: (1) she suffers from a disability or handicap, as defined by the ADA; (2) she was nevertheless able to perform the essential functions of her job, either with or without reasonable accommodation; and (3) the employer took an adverse employment action against her because of her protected disability. *Id.* For a failure to accommodate claim, a plaintiff must show the first two prongs set forth above and, that the employer, despite knowing of the alleged disability, did not reasonably accommodate it. *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999). Unlike a disparate treatment claim, the employee does not need to show that the employer's action was motivated by a discriminatory animus. Instead, "an employer who knows of a disability yet fails to make reasonable accommodations violates the statute, no matter what its intent." *Id.*

20

Buckman contends that Coad's disability claims fail because she was not disabled; she was not otherwise qualified; and her requested accommodation was not reasonable as a matter of law.[7] Def.'s Mot. for Summ. J. 8-13. Because the ADA and the MHRA are "construed and applied along the same contours," *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 312 (1st Cir. 2003), I follow the parties' lead and focus my inquiry on federal case law interpreting the ADA.

### A. Whether Coad was Disabled

Under the ADA, a disability is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). In addition, the Equal Employment Opportunity Commission has identified "interacting with others" as a major life activity. *See* 29 C.F.R. § 1630.2(i)(1)(i). In 2008, the ADA was amended to note that "[t]he definition of disability in this [Act] shall be construed in favor of broad coverage of individuals under this [Act], to the maximum extent permitted by the terms of this [Act]." 42 U.S.C. § 12102(4)(A). Congress also instructed courts "that the question of whether an individual's impairment is a disability under the ADA should not demand

---

[7]     Although a footnote in Buckman's motion notes that "[t]he *McDonnell Douglas* framework applies to disability claims[,]" its briefing focuses on Coad's ability to prove that she was disabled within the meaning of the ADA, otherwise qualified, and the reasonableness of her requested accommodation. Def.'s Mot. for Summary J. 8 n.6. I limit my analysis to these arguments.

extensive analysis." ADA Amendments Act of 2008, Pub.L. No. 110–325, § 2(b)(5), 122 Stat. 3553.

The record contains evidence that Coad's anxiety impacted several major life activities. Tenney testified that she treated Coad for acute anxiety over the course of six months and that Coad's anxiety significantly impaired her health in comparison to the population at large. PSAMF ¶ 198. Coad's symptoms included "an inability to focus or concentrate, sleep disruption, difficulty forming rational thoughts, nausea, and racing thoughts." Coad Aff. ¶ 11. These symptoms led Coad to avoid social situations by staying at home and becoming "somewhat of a hermit" because it was difficult for her to interact with others—including her husband. Coad Aff. ¶ 11.

Buckman contends that Coad was not disabled within the meaning of the ADA because she was only substantially limited in the major life activity of working at Buckman, but not at other jobs. *See* Def.'s Mot. for Summ. J. 9-10. Buckman points to the regulations interpreting the ADA, which state: "Demonstrating a substantial limitation in performing the unique aspects of a single specific job is not sufficient to establish that a person is substantially limited in the major life activity of working." "Substantially Limited in Working," Appendix to Part 1630—Interpretive Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. Pt. 1630, App. Buckman cites cases holding that someone who suffers a situational impairment in a particular work environment is not disabled for purposes of the ADA. Def.'s Mot. for Summary J. 9 (citing *Maslanka v. Johnson & Johnson, Inc.,* 305 F. App'x 848, 852 (3d Cir. 2008); *Benson v. Cal. Corr. Peace Officers' Assoc.*, No. 2:08-cv-0886-JFM PS, 2010 WL

682285 (E.D. Cal. Feb. 24, 2010)). While these cases do stand for the proposition that the inability to perform a particular job does not constitute a substantial limitation of the major life activity of "working," they do not address the situation where the plaintiff asserts that major life functions other than "work" are significantly impaired. Here, the Plaintiff has asserted and provided record support for her claim that major life functions other than work—sleeping, concentrating, thinking and interacting with others—have been significantly impaired. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i)(1)(i). She has raised a triable issue on this element.

## B. Whether Coad was a Qualified Individual

In order to maintain her disability claims, Coad has the burden of showing: " 'first, that she possesses the requisite skill, experience, education and other job-related requirements for the position, and second, that she is able to perform the essential functions of the position with or without reasonable accommodation.' " *Mulloy v. Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006) (quoting *García-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 646 (1st Cir. 2000)). Buckman does not dispute the first requirement, but contends that Coad has not satisfied the second because she "has failed to show that she could perform an essential function of the position, namely, full-time work" because she "was permanently restricted from working at Buckman for more than four hours a day."[8] Def.'s Mot. for Summ. J. 10.

---

[8]        In support of this argument, Buckman cites *Collins v. NTN-Bower-Corp.*, where the Seventh Circuit noted that the ADA "protects only persons who *over the long run* are capable of working full time." 272 F.3d 1006, 1007 (7th Cir. 2001) (emphasis added). But Buckman's argument glosses over the italicized language above and ignores evidence in the record suggesting that Coad was not permanently restricted from working full-time.

Assuming full-time work is an essential function of the account manager position, there is sufficient evidence in the record showing that Coad was not permanently restricted from full-time work at Buckman. When Coad was attempting to return to work part-time in April of 2013, Tenney was only recommending part-time work for two weeks to see if Coad could tolerate returning to Buckman full-time. Tenney Dep. 76:5-16 (ECF No. 40-6). Tenney wanted to initially limit Coad to four hour workdays "on a trial basis to see if [working] for shorter periods of time would be less distressing." Tenney Dep. 76:1-4 (ECF No. 40-6). After this trial basis concluded, Tenney wanted to reevaluate Coad to see if she could return to Buckman full-time. Tenney Dep. 76:5-16 (ECF No. 40-6). And although Tenney released Coad to return to full-time work in any setting besides Buckman on August 16, 2013 (after Coad had already been terminated by Buckman) Tenney testified that this was not a permanent restriction. Tenney Dep. 124:9-11. Tenney's explanation for why and how long she was recommending the part-time restriction is not perfectly consistent throughout her deposition. But there is sufficient evidence for a jury to conclude that the part-time restriction was only temporary, particularly when Tenney was recommending it in April of 2013.

Furthermore, Coad is a qualified individual if she is able to perform the essential functions of the job with or without reasonable accommodation. Under the ADA, "[r]easonable accommodations may include 'job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . and other similar

_____

accommodations for individuals with disabilities.'" *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 23 (1st Cir. 2004) (quoting 42 U.S.C. § 12111(9)(B)).

Here, Buckman correctly points out that it was not required to create a new part-time position for Coad. *See, e.g., Lamb v. Qualex, Inc.*, 33 F. App'x 49, 59 (4th Cir. 2002) ("The ADA does not, however, require an employer to create a new position as an accommodation to a disabled employee."). But granting Coad a *temporary* part-time schedule might have made it possible for her to perform an essential function of her job—full-time work. Accordingly, the question of whether Coad was a qualified individual remains open.

## C. Failure to Reasonably Accommodate

An employer offends the ADA if it fails to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). Claims for failure to provide a reasonable accommodation require "difficult, fact intensive, case-by-case analyses, ill-served by per se rules or stereotypes." *García-Ayala*, 212 F.3d at 650; *see also Jacques v. Clean-Up Grp., Inc.*, 96 F.3d 506, 515 (1st Cir. 1996) ("[C]ases involving reasonable accommodation turn heavily upon their facts and an appraisal of the reasonableness of the parties' behavior.").

Buckman argues that Coad "was granted a leave of absence as an accommodation" after receiving medical notes from Tenney in March of 2013. Def.'s Mot. for Summ. J. 11. Coad counters that Buckman was required to do more and that

25

"Buckman's refusal to allow [her] to return initially on a part-time basis was purely spiteful and was a *per se* violation of its duty to accommodate her disability under the law." Pl.'s Opp'n 14.

A "request for accommodation sometimes creates a duty on the part of an employer to engage in an interactive process." *E.E.O.C. v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014) (citation and internal quotation marks omitted). Although the "scope of the employer's obligation in this process is not crystal clear," *see Calero-Cerezo*, 355 F.3d at 24, at a minimum, "once the employer becomes aware of the disability of an employee, he is expected to engage in a meaningful dialogue with the employee to find the best means of accommodating that disability." *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2005). Both parties must cooperate in the interactive process. "If an employer engages in an interactive process with the employee, in good faith, for the purpose of discussing alternative reasonable accommodations, but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for a failure to provide reasonable accommodations." *Kohl's Dep't Stores*, *Inc.*, 774 F.3d at 132. Likewise, an employer may violate the ADA if it refuses to engage in the interactive process. *See Jacques*, 96 F.3d at 515.

Contrary to Buckman's contention, genuine issues of material fact exist regarding who bears responsibility for the breakdown in communication between the parties. When Carla Bradley e-mailed Coad that Buckman did not have a "light-duty position for account managers[,]" she did not offer any alternative accommodation or

request more information about why Coad sought a two-week part-time schedule. Ex. 26 to Coad Dep. Further, after Coad e-mailed Bradley asking for reconsideration, Bradley simply responded by saying that Buckman had determined that it did not have light duty positions for account managers. Ex. 27 to Coad Dep. Although Buckman contends that Coad withdrew from the interactive process, Def.'s Reply & Mem. Of Law in Opp'n to Pl.'s Partial Mot. for Summ. J. 5 ("**Def.'s Reply**") (ECF No. 45), a reasonable jury could fault Bradley—who responded to Coad's e-mail requesting reconsideration in nine minutes—as the party who withdrew from the interactive process. Further, taking the evidence in the light most favorable to the plaintiff, an inference can be drawn based on the February 2013 e-mail from Smithson to Desjardins that Buckman never intended to engage in a good faith interactive process. This dispute cannot be resolved as a matter of law.[9]

## III.    Whistleblower Retaliation—Count I

The Maine Whistleblower Protection Act (the "**MWPA**") "protects an employee from discrimination when he has complained to the employer in good faith about a workplace-related condition or activity that he reasonably believes is illegal, unsafe,

---

[9]    Relying on Tenney's July 22, 2013 medical excuse, Buckman contends that it did not have to hold Coad's position open for her indefinitely. Def.'s Mot. for Summ. J. 13. Requests for indefinite leave are generally not reasonable as a matter of law. *See Henry v. United Bank*, 686 F.3d 50, 60-61 (1st Cir. 2012). But like the earlier medical excuses, the July 22, 2013 medical excuse only restricted Coad from full-time work until October 22, 2013. *See* Coad Dep. 224:13-20. Accordingly, this case is distinguishable from *Henry* where "as of the date of her termination, the plaintiff could not work in her position at all and had given the [employer] neither a relative time frame for her anticipated recovery nor any indication of when or whether she would ever be able to return to her . . . position in the future." *Henry*, 686 F.3d at 60.

or unhealthy."[10] *Higgins*, 194 F.3d at 261. In order to survive a motion for summary judgment, a plaintiff must produce sufficient evidence showing: "(1) that the employee engaged in activity protected by the [M]WPA; (2) that the employer imposed adverse employment action against the employee; and (3) that there was a causal connection between the protected activity and the adverse employment action." *Cormier v. Genesis Healthcare LLC*, 129 A.3d 944, 948 (Me. 2015). If the plaintiff does not "produce evidence generating a triable issue on each" element then summary judgment for the employer is proper. *Brady v. Cumberland Cty.*, 126 A.3d 1145, 1159 (Me. 2015).

Buckman argues that Coad cannot maintain her MWPA claim because it was part of her job responsibilities to make the safety-related complaints that form the basis of her claim, and alternatively that there is no causal connection between Coad's supposed protected conduct and her termination. Def.'s Mot. for Summ. J. 13-17.

## A. Whether Coad Engaged in Protected Activity

The MWPA "protects employees who, in good faith, make safety-related complaints when the employee reasonably believes that a dangerous condition or practice exists." *Cormier*, 129 A.3d at 949. Complaints are made in good faith where an employee's "motivation is to stop a dangerous condition." *Id*. An employee's belief

---

[10]   Though the MWPA does not provide a direct cause of action for whistleblowers, such claims can be brought under the Maine Human Rights Act (the "**MHRA**"), which "provides a right of action to individuals 'who have been subject to unlawful discrimination, including whistleblowers who have suffered retaliatory discharge or other adverse employment actions.' " *Winslow v. Aroostook Cty.*, 736 F.3d 23, 30 n.6 (1st Cir. 2013) (quoting *Costain v. Sunbury Primary Care, P.A.*, 954 A.2d 1051, 1053 (Me. 2008)).

that a dangerous condition or practice exists is reasonable if it is both subjectively and objectively reasonable. *Stewart-Dore v. Webber Hosp. Ass'n*, 13 A.3d 773, 776 (Me. 2011).

Coad raised numerous safety concerns during her employ at Buckman. She repeatedly complained about how Fred Call ("**Call**") was handling the Oxamine trial. In October of 2012, Coad sent an e-mail to Desjardins about making sure that safety training existed. Ex. 3 to Desjardins Dep. A few days later, Coad  expressed frustration with the roll out of the Oxamine system in another e-mail and demanded that Call take several steps before sending a document to Verso about the system. Ex. 4 to Desjardins Dep. There was an incident where Zebiak returned from the Oxamine system showing signs of respiratory distress. Coad suspected that there had been a chlorine gas leak and told Desjardins that they needed to inform the mill. Coad Dep. 145:4-21. But Desjardins "shut [Coad] right down" and said they were not going to report the incident to the mill. Coad Dep. 144:15-23. And on December 26, 2012, Coad sent a lengthy e-mail detailing a sodium hypochlorite leak at the Oxamine unit and describing how an absorbent towelette she was using to clean the leak smoldered and became warm. Ex. 6 to Desjardins Dep. 39. Ultimately, Coad raised the safety issues that were troubling her to Verso.

Citing *Winslow v. Aroostook Cty.*, 736 F.3d 23, 32 (1st Cir. 2013), Buckman argues that Coad did not engage in whistleblowing as a matter of law because "safety was one of [Coad's] primary job duties" and "Buckman encouraged reports of potential safety violations." Def.'s Mot. for Summ. J. 15. But the First Circuit has recently

explained that *Winslow* did not establish a "job duties exception" to the MWPA. *See Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36, 48 (1st Cir. 2016). Rather, "the critical point when analyzing whether a plaintiff has made out the first element of a Whistleblower Act claim—engaging in activity protected by the Act—is an employee's motivation in making a particular report or complaint." *Id*. at 51. Though a plaintiff's job duties may be relevant in helping to explain why she reported certain information, "those duties are not dispositive of the question." *Id*. Given Dr. McNeel's warnings coupled with Coad's experience with the leaky Oxamine system, there is enough evidence for a reasonable jury to conclude that Coad's safety complaints were both subjectively and objectively reasonable. And given Desjardin's resistance to notifying the mill after the Zebiak incident, and Coad's willingness to take her complaints to Verso, there is sufficient evidence to allow a jury to conclude that Coad was going beyond her job duties and was motivated by her desire to report a dangerous condition. Thus, I cannot say as a matter of law that Coad did not engage in conduct protected by the MWPA.

### B. Causation

Buckman contends that Coad's whistleblower claim fails "because she has no evidence of any connection between her alleged reports and her termination." Def.'s Mot. for Summ. J. 16. Buckman argues that the period of time between Coad's protected activity and her termination in July of 2013 is too long to support a reasonable inference of causation.

Viewing the record in the light most favorable to Coad, a jury could reasonably conclude that Coad suffered an adverse employment action well before she was terminated in July of 2013. On February 26, 2013, Coad was forced out of work to attend anger management counseling. "An employee has suffered an adverse employment action when the employee has been deprived either of 'something of consequence' as a result of a demotion in responsibility, a pay reduction, or termination, or the employer has withheld 'an accouterment of the employment relationship . . . .'" *LePage v. Bath Iron Works Corp.*, 909 A.2d 629, 636 (Me. 2006) (quoting *Blackie v. State of Maine*, 75 F.3d 716, 725 (1st Cir. 1996)). Because Buckman told Coad she could not return to work until she was cleared to do so, a jury could find that Coad was essentially given a suspension, which can constitute an adverse action. *See, e.g., Ramsdell v. Huhtamaki, Inc.*, 992 F. Supp. 2d 1, 17 (D. Me. 2014). Here, a jury could decide that the obligatory anger management counseling was an adverse employment action.[11]

Although the exact dates for all of Coad's safety-related complaints are unknown, Coad clearly made several complaints about the Oxamine system toward the end of 2012. "Under Maine law, close temporal proximity between the protected activity and the adverse action is a sufficient showing of causation for the purpose of

---

[11] This conclusion is reinforced by Smithson's e-mail exchange with Desjardins before the February 26th meeting, where he suggests he was going to force Coad's resignation. *See* PSAMF ¶ 153.

establishing a plaintiff's prima facie case." *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015).

In addition, Smithson's comments to Coad in February of 2013 support an inference that Buckman took adverse employment action because of Coad's protected conduct. During Smithson's telephone conversation with Coad on February 22, 2013, he told Coad that she "had complained enough" and that she had "defied him." Coad Aff. ¶ 8. Smithson also echoed these comments at the February 26, 2013 meeting with Coad. PSAMF ¶ 156.[12] These conversations came on the heels of Coad's February 14, 2013 meeting with Archambeau where Coad disclosed that there had been leaks in the Oxamine system and that Buckman had discharged chemicals in Verso's drainage system.[13] Archambeau Aff. ¶ 5.

I find that there are disputed material facts; a jury should decide this claim. Accordingly, Buckman is not entitled to judgment as a matter of law.

## IV.    Breach of Contract and Unpaid Wages Claims—Counts IV and V

---

[12]    Buckman argues that Smithson's comment that Coad had complained enough referenced the job-related complaints voiced by Coad during the fall of 2012 and into 2013 concerning, *inter alia*, her salary, her lack of authority over other employees, and staffing shortages. That may well be a reasonable inference, but it is not the only inference that can be drawn on this record.

[13]    Buckman contends that there is no evidence in the record demonstrating that Smithson actually knew Coad brought up safety concerns to Archambeau. Def.'s Reply 7. Smithson testified that he could not recall whether Archambeau informed him that Coad had raised safety concerns at their meeting. Smithson Dep. 29:19-22 (ECF No. 46-4). Viewing the evidence in the light most favorable to Coad, the timing and nature of Smithson's remarks support the reasonable inference that Smithson was aware that Coad relayed safety concerns about the Oxamine system to Archambeau.

Both parties move for summary judgment on Coad's claim for breach of contract and unpaid wages, thus I consider both motions separately, viewing the record in the light most favorable to the non-moving party. I apply Tennessee law in analyzing the parties' motions in accordance with the contract's choice of law provision and the parties' briefing. *See* Ex. 5 to Coad Dep.

Under Tennessee law, "[t]he essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *Evans v. Walgreen Co.*, 813 F. Supp. 2d 897, 941-42 (W.D. Tenn. 2011) (citation and internal quotation marks omitted). There is no dispute regarding the existence of an enforceable contract—the principal question is whether a breach occurred.

In relevant part, the employment contract provides:

> [Buckman] has agreed and does hereby agree to employ [Coad], and [Coad] has agreed and does hereby agree to accept employment by [Buckman] in the performance of such duties as may be designated and assigned by [Buckman] from time to time . . .
>
> . . . employment may be terminated by either party, with or without cause, upon no fewer than forty-five (45) days' notice in writing of such termination . . .
>
> The aforesaid duties and work of [Coad] for [Buckman] shall be [Coad's] sole employment during the life of the agreement . . . .

Ex. 5 to Coad Dep.

## A. Coad's Motion

The crux of Coad's argument is that Buckman breached the contract as a matter of law by refusing to permit Coad to return to work part-time. Pl.'s Opp'n 20;

Pl.'s Reply Mem. in Support of Pl.'s Mot. for Partial Summ. J. 2  (ECF No. 47). Thus,

Coad contends that Buckman owes her full wages, commissions, and bonuses for the

five months that she did not work.[14] Pl.'s Opp'n 20. But the authority[15] Coad cites is

plainly inapposite. The undisputed facts here establish that Buckman only told Coad

that it did not have a part-time position available. This did not prevent nor make it

impossible for Coad to work full-time against Tenney's advice. There is nothing in the

contract or the record supporting Coad's argument that she was entitled to pay while

she did not work. The contract does not require Buckman to pay Coad while on leave

or to provide her with a part-time position, and Buckman did not breach the contract

by informing Coad that it did not have such a position available. Coad's argument

essentially amounts to an attempt to graft the ADA's requirements onto her

employment contract. And, while the ADA may at times require an employer to offer

a disabled employee a part-time schedule as an accommodation, by its plain terms

Coad's employment contract does not. Thus, Buckman did not breach the contract.

---

[14]     In response to a demand letter sent by Coad's counsel in September of 2013, Buckman sent Coad a cashier's check for $27,607.38. *See* Ex. 4 to DSMF (ECF No. 30-5). Buckman states that this check "represented the two weeks' of vacation pay (not four) that [Coad] demanded, the cash equivalent of 45 days' notice, and her commissions, none of which were tied to the actual work she did or did not perform." Def.'s Mot. for Summ. J. 17. Accordingly, Buckman contends that this check moots Coad's claims for vacation pay and for the 45 day notice period. Def.'s Mot. for Summ. J. 17. Coad has not challenged Buckman's argument or its calculation of the $27,607.38 figure.

[15]     Coad cites case law discussing repudiation. Under Tennessee law, in order to serve as a repudiation, "the words and conduct of the contracting party must amount to a total and unqualified refusal to perform the contract." *Wright v. Wright*, 832 S.W.2d 542, 545 (Tenn. Ct. App. 1991);  *see also Tidwell v. Alexander*, Nos. 01-A-01-9508-cv00378, 93367, 1996 WL 35907, at **3-4 (Tenn. Ct. App. Jan. 31, 1996) (defendant repudiated  construction contract where he excluded plaintiff from inspections, refused to pay draw requests, began negotiating with other parties for estimates on completing the project, and changed the locks to the work site without providing the plaintiff or his employees a key).

Coad notes that the contract required her to work only for Buckman, and erroneously argues that she "was not free to seek work elsewhere despite Buckman's refusal to allow her to return." Pl.'s Opp'n 20. But Coad was free to seek work elsewhere, so long as she provided 45 days' notice to Buckman. *See* Ex. 5 to Coad Dep. Therefore, Coad's argument that she is entitled as a matter of law to full compensation for the five month period she did not work is unfounded, and her motion for summary judgment on this claim is denied.

This conclusion forecloses Coad's motion for summary judgment on her claim for unpaid wages. In relevant part, Maine's unpaid wages statute provides: "An employee leaving employment must be paid in full within a reasonable time after demand . . . . Whenever the terms of employment include provisions for paid vacations, vacation pay on cessation of employment has the same status as wages earned." 26 M.R.S.A. § 626. But an employee's "employment agreement, not section 626, governs how wages are earned and, if specified, when wages are to be paid." *Bernier v. Merrill Air Eng'rs*, 770 A.2d 97, 101 (Me. 2001) (citation and internal quotation marks omitted). Thus, Coad's "entitlement to payment" under the statute "is governed solely by the terms of [her] employment agreement." *Richardson v. Winthrop Sch. Dep't*, 983 A.2d 400, 402 (Me. 2009). Because Coad is not entitled to payment under her employment agreement, her motion for summary judgment for unpaid wages is denied.

### B. Buckman's Motion

For the reasons stated above, Buckman's motion for summary judgment is granted with respect to Coad's breach of contract and unpaid wages claims.

## V.   Personnel File Claim—Count VI

Coad's final claim is that Buckman failed to timely produce her personnel file in violation of Maine law. Under 26 M.R.S.A. § 631:

> Any employer who, following a request pursuant to this section, without good cause fails to provide an opportunity for review and copying of a personnel file, within 10 days of receipt of that request, is subject to a civil forfeiture of $25 for each day that a failure continues. The total forfeiture may not exceed $500. An employee, former employee or the Department of Labor may bring an action in the District Court or the Superior Court for such equitable relief, including an injunction, as the court may consider to be necessary and proper. The employer may also be required to reimburse the employee, former employee or the Department of Labor for costs of suit including a reasonable attorney's fee if the employee or the department receives a judgment in the employee's or department's favor, respectively.

Coad requested a copy of her personnel file on September 25, 2013. *See* Ex. 2 to DSMF 2 (ECF No. 30-3). Buckman did not produce Coad's personnel file until September of 2014. *See* Ex. 5 to DSMF 2-3 (ECF Nn. 30-6); DSMF ¶ 94.

Buckman contends that Coad's claim for equitable relief under § 631 is moot because she received her entire personnel file through discovery. Def.'s Mot. for Summ. J. 19. Coad counters by arguing that Buckman "cannot avoid paying attorney's fees and costs by refusing to produce the personnel file until after an employee files suit, then producing it in discovery." Pl.'s Opp'n 21

Coad has already acquired her personnel file and concedes that § 631 does not provide her with a private right of action to seek civil forfeiture. But Coad also seeks

a declaration that Buckman unlawfully failed to provide her with a copy of her personnel file, attorney's fees, and costs—all of which are available under the statute. It is undisputed that Buckman did not produce Coad's personnel file within 10 days of its receipt of her request. Thus, there is no genuine dispute of material fact regarding whether Buckman violated the statute, and I declare that Buckman violated 26 M.R.S.A. § 631. Coad is entitled to summary judgment on this count.[16]

## CONCLUSION

For the reasons stated above, the Defendant's motion for summary judgment (ECF No. 30) is **GRANTED** with respect to Counts IV and V (breach of contract and unpaid wages) and **DENIED** with respect to the remaining counts. The Plaintiff's motion for partial summary judgment (ECF No. 44) is **GRANTED** with respect to Count VI (personnel file claim) and **DENIED** with respect to the remaining counts.

SO ORDERED.

 /s/ Nancy Torresen
United States Chief District Judge

Dated this 18th day of March, 2016.

---

[16]    Any issue regarding attorney fees and costs can be determined at a later date.